**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       *Plaintiff*,<br><br>    v.<br><br>CENTURYLINK, INC.<br><br>and<br><br>LEVEL 3 COMMUNICATIONS, INC.,<br><br>       *Defendants*. | Civil Action No. __17-2028____ |

**<u>FINAL JUDGMENT</u>**

WHEREAS, Plaintiff, United States of America, filed its Complaint on October 2, 2017, the United States and defendants, CenturyLink, Inc. and Level 3 Communications, Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.  JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.  DEFINITIONS

As used in this Final Judgment:

A.      "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

B.      "CenturyLink" means defendant CenturyLink, Inc., a Louisiana corporation with its headquarters in Monroe, Louisiana, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.      "Level 3" means defendant Level 3 Communications, Inc., a Delaware corporation with its headquarters in Broomfield, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

D.      "Customer Premises Equipment" means equipment located on the customer premises side of the demarcation point with the telecommunications service provider and used to serve one customer at the location.

E.      "Dark Fiber" means fiber optic strands provided without electronic or optronic equipment.

F.      "Divestiture Assets" means the MSA Divestiture Assets and the Intercity Dark Fiber Assets.

G.      "Divestiture MSA" means, separately, the MSAs of (1) Albuquerque, New Mexico; (2) Boise City-Nampa, Idaho; and (3) Tucson, Arizona.

H.      "Gateway Location," means a facility in or near an MSA where intercity fiber terminates and connects with a Metropolitan Area Network and/or other intercity fiber.

I.      "Intercity Dark Fiber Assets" means IRUs for 24 strands of Dark Fiber in the same cable, if available, or if not available in the same cable, then in the same duct bank, on the Intercity Routes and any Dark Fiber necessary to connect any Intercity Route with another Intercity Route that terminates at a different Gateway Location in the same MSA.  The term "Intercity Dark Fiber Assets" shall be construed as broadly as necessary to accomplish the purposes of this Final Judgment and any IRU shall provide the following:

(1)      A term of twenty-five (25) years, with two options to extend for two (2) additional five (5) year terms (for a total of ten (10) years), exercisable at the Acquirer's sole discretion at any time during the initial 25-year term so long as written notice is provided to the defendants at least ninety (90) days prior to the expiration of the IRU term, and, for each five-year

renewal term, at a price not to exceed 20% of the fee initially paid by the Acquirer for the Intercity Dark Fiber Assets;

(2)     Subject to the approval of the United States, in its sole discretion, customary terms and conditions, including terms regarding respective operations and maintenance rights and obligations; fiber quality, testing, and technical performance; access; and cooperation;

(3)     The right to assign the IRU, in whole or in part, without the consent of defendants; and

(4)     All additional rights defendants have that are necessary (including, as needed, rights to access and occupy space in defendants' facilities) to enable the Acquirer or its assignee to provide telecommunications services using the Intercity Dark Fiber Assets.

J.     "Intercity Routes" means Dark Fiber connecting the endpoints specified in Appendix B.

K.     "IRU" means indefeasible right of use, a long-term leasehold interest that gives the holder the exclusive right to use specified fiber optic strands in a telecommunications facility for a stated term.

L.     "Lateral Connection" means fiber optic strands, from the demarcation point in a building, including any equipment at the demarcation point necessary to connect the fiber to Customer Premises Equipment, to the point at which such fiber optic strands are spliced with other fiber optic strands that serve multiple buildings, and any existing related duct, conduit, or other containing or support structure.

M.      "Majority MSA Customers" means MSA Customers for which, as of August 2017, Level 3's monthly recurring revenues were greater in the Divestiture MSAs than outside the Divestiture MSAs.

N.      "Metropolitan Area Network" means fiber optic strands that are used to connect Lateral Connections to one another and to Gateway Locations and any existing related duct, conduit or other containing or support structure.

O.      "MSA" means Metropolitan Statistical Area, as defined by the Office of Management and Budget.

P.      "MSA Customers" means customers who purchase telecommunications services from Level 3 at a location within any of the Divestiture MSAs, but shall not include the customers listed in Appendix A.

Q.      "MSA Divestiture Assets" means all Level 3 assets, tangible and intangible, used exclusively or primarily to support Level 3's provision of telecommunications services to customer locations in the Divestiture MSAs, including, but not limited to, Lateral Connections, Metropolitan Area Network; ownership and access rights to all ducts, conduit, and other containing or support structure used by Level 3 to operate or augment such Lateral Connections and Metropolitan Area Network; and all switching, routing, amplification, co-location, or other telecommunications equipment used in or associated with those networks in each Divestiture MSA, up to Level 3's Gateway Location(s) in each Divestiture MSA.  The MSA Divestiture Assets shall also include other assets used by Level 3 for its provision of telecommunications services to customer locations in each Divestiture MSA, including, but not limited to, all licenses, permits and authorizations related to the MSA Divestiture Assets issued by any governmental organization to the extent that such licenses, permits and authorizations are

transferrable and such transfer would not prevent Level 3 from providing telecommunications services in the three Divestiture MSAs; all contracts (except as otherwise excluded by the terms of this Final Judgment), teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; all MSA Customer lists (including the name of each MSA Customer and each Majority MSA Customer, the address of each MSA Customer location within the Divestiture MSAs, and the address of each Majority MSA Customer location within the Divestiture MSAs and outside the Divestiture MSAs); all repair and performance records relating to the MSA Divestiture Assets; and all other records relating to the MSA Divestiture Assets reasonably required to permit the Acquirer to conduct a thorough due diligence review of and to operate the MSA Divestiture Assets.  The MSA Divestiture Assets shall not include assets, wherever located, used exclusively or primarily in or in support of Level 3's provision of telecommunications services outside the Divestiture MSAs, including the provision of telecommunications services between MSAs.

The term "MSA Divestiture Assets" shall be construed as broadly as necessary to accomplish the purposes of this Final Judgment and is subject to the following:

(1)     The MSA Divestiture Assets shall not include Customer Premises Equipment in a location in a Divesture MSA currently owned by Level 3 unless and until the customer chooses the Acquirer as its supplier pursuant to Section IV(K) for that location; and

(2)     Level 3's contracts to provide telecommunications services to customers are not included as MSA Divestiture Assets, but are subject to the process specified in Sections IV(K) and IV(L) of this Final Judgment.

### III.  APPLICABILITY

A.     This Final Judgment applies to CenturyLink and Level 3, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Section IV, Section V, and Section VI of this Final Judgment, defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the acquirers of the assets divested pursuant to this Final Judgment.

### IV.  DIVESTITURE OF MSA DIVESTITURE ASSETS

A.     Defendants are ordered and directed, within 120 calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the MSA Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer or Acquirers in each Divestiture MSA and on terms acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances.  If approval or consent from any government unit is necessary with respect to divestiture of the MSA Divestiture Assets by defendants or the Divestiture Trustee and if applications or requests for approval or consent have been filed with the appropriate governmental unit within five (5) calendar days after the United States provides written notice pursuant to Section VII(E) that it does not object to the proposed Acquirer, but an order or other dispositive action on such applications has not been issued before the end of the period permitted for divestiture, the period shall be extended with

respect to divestiture of those MSA Divestiture Assets for which governmental approval or consent has not been issued until five (5) calendar days after such approval or consent is received.  Defendants agree to use their best efforts to divest the MSA Divestiture Assets and to seek all necessary regulatory or other approvals or consents necessary for such divestitures as expeditiously as possible.

B.      In accomplishing the divestitures ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the entire MSA Divestiture Assets.  Defendants shall inform any person making an inquiry regarding a possible purchase of the MSA Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the MSA Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.      With respect to each Divestiture MSA, defendants shall provide the Acquirer of MSA Divestiture Assets and the United States information relating to the personnel whose primary responsibilities relate to the operation of any MSA Divestiture Asset to enable the Acquirer to make offers of employment.  Defendants will not interfere with any negotiations by the Acquirer to employ such personnel.

D.      Defendants shall permit prospective Acquirers of the MSA Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the MSA Divestiture Assets; access to any and all environmental, zoning, title, right-of-way, and

other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E.      Defendants shall warrant to any Acquirer(s) that the MSA Divestiture Assets will be operational on the date of sale.

F.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the MSA Divestiture Assets.

G.      Subject to approval by the United States, defendants may enter into a negotiated contract with each Acquirer of MSA Divestiture Assets for a period of two (2) years from the closing date of the divestiture of the MSA Divestiture Assets, under which the Acquirer would provide to defendants all Lateral Connections and associated Metropolitan Area Network needed to support Level 3 customers in the applicable Divestiture MSA that choose to remain customers of defendants.

H.      At the option of the Acquirer(s), defendants shall enter into a Transition Services Agreement for any services that are reasonably necessary for the Acquirer(s) to maintain, operate, provision, monitor, or otherwise support the MSA Divestiture Assets, including any required back office and information technology services, for a period of up to twelve (12) months.  The United States, in its sole discretion, may approve one or more extensions of this agreement for a total of up to an additional twelve (12) months.  Defendants shall perform all duties and provide all services required of defendants under the Transition Services Agreement. The terms and conditions of any contractual arrangement meant to satisfy this provision must be reasonably related to market conditions.  Any amendments, modifications or extensions of the Transition Services Agreement maybe entered into only with the approval of the United States, in its sole discretion.

I.      Defendants shall use their best efforts to obtain from any third parties that provide Level 3, on a leased or IRU basis, Lateral Connections and Metropolitan Area Network in the Divestiture MSAs any consent necessary to transfer, assign, or sublease to the Acquirer the contract(s) for such Lateral Connections or Metropolitan Area Network to the extent related to the MSA Divestiture Assets and will effectuate the transfer, assignment, or sublease of such contract(s) to the Acquirer.  The Acquirer and defendants may enter into a commercial services agreement to replace the service provided by any Level 3 Lateral Connections and Metropolitan Area Network in the Divestiture MSAs currently provided to Level 3 on a leased or IRU basis (1) if, because of withheld consent, the parties are unable to transfer, assign, or sublease to the Acquirer any contract(s) for such Lateral Connections or Metropolitan Area Network in the Divestiture MSAs currently provided to Level 3 on a leased or IRU basis; or (2) at the option of the Acquirer and subject to approval by the United States, in its sole discretion.  Defendants shall use their best efforts to obtain from any third parties that provide Level 3 rights of way, access rights, or any other rights to operate, expand, or extend Lateral Connections or Metropolitan Area Network in the Divestiture MSAs any consent necessary to transfer such rights to the Acquirer(s).

J.      Defendants shall warrant to the Acquirer(s) that they are not aware of any material defects in the environmental, zoning, title, right-of-way, or other permits pertaining to the operation of each asset, and that following the sale of the MSA Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, title, right-of-way, or other permits relating to the operation of the MSA Divestiture Assets.

K.      For each Divestiture MSA, beginning on the closing date of the sale of the MSA Divestiture Assets and continuing for a period of the lesser of two (2) years from the closing date

of the sale or the expiration of an MSA Customer's contract, provided the expiration is at least thirty (30) days after the closing date of the sale, defendants shall

    (1)    release the MSA Customers from their contractual obligations for any otherwise applicable termination fees for telecommunications services provided by Level 3 at locations within the applicable Divestiture MSA, in order to enable any MSA Customers, without penalty or delay, to elect to use the Acquirer for provision of such telecommunications services, and

    (2)    for any Majority MSA Customers, defendants shall release such customers from their contractual obligations for all Level 3 services for any otherwise applicable termination fees charged by defendants, at all locations serviced by Level 3, even if located outside the applicable Divestiture MSA, provided that defendants and Acquirer shall each be required to pay half of any third-party fees associated with the termination of delivery of telecommunications services to each Majority MSA Customer at each terminated location outside the Divestiture MSAs, in order to enable these customers, without penalty imposed by defendants or delay, to elect to use the Acquirer for the provision of such telecommunications services.

    L.    For a period of two (2) years following the entry of this Final Judgment, defendants shall not initiate customer-specific communications to solicit any MSA Customer or Majority MSA Customer to provide any telecommunications services to locations for which such customers have elected to use an Acquirer as its provider of telecommunications services pursuant to the process specified in Section IV(K) of this Final Judgment; provided however, that defendants may (1) respond to inquiries and enter into negotiations to provide service at these locations or other locations at the request of the customer and (2) except for any location at

-11-

which the MSA Customer has elected to use an Acquirer as its provider of telecommunications

services pursuant to the process specified in Section IV(K), continue to solicit business

opportunities from any MSA Customer that was prior to the entry of this Final Judgment a

customer of CenturyLink in the Divestiture MSA.

M.     Within fifteen (15) business days of the date of the sale of any MSA Divestiture

Assets to an Acquirer, defendants shall communicate, in a form approved by the United States in

its sole discretion, to all MSA Customers notifying the recipients of the divestiture and providing

a copy of this Final Judgment.  Defendants shall provide the United States a copy of this

notification at least ten (10) business days before it is sent.  The notification shall specifically

advise customers of the rights provided under Sections IV(K) and IV(L) of this Final Judgment.

The Acquirer shall have the option to include its own notification along with defendants'

notification.

N.     Unless the United States otherwise consents in writing, the divestitures pursuant

to Section IV, or by Divestiture Trustee appointed pursuant to Section VI, of this Final

Judgment, shall include the entire MSA Divestiture Assets and shall be accomplished in such a

way as to satisfy the United States, in its sole discretion, that the MSA Divestiture Assets can

and will be used by the Acquirer or Acquirers as part of a viable, ongoing business providing

telecommunications services.  Divestiture of the MSA Divestiture Assets may be made to one or

more Acquirers, provided that (i) all MSA Divestiture Assets in a given Divestiture MSA are

divested to a single Acquirer unless otherwise approved by the United States, in its sole

discretion, and (ii) in each instance it is demonstrated to the sole satisfaction of the United States

that the MSA Divestiture Assets will remain viable and the divestiture of such assets will remedy

the competitive harm alleged in the Complaint.  The divestitures, whether pursuant to Section IV or Section VI of this Final Judgment,

    (1)    shall be made to an Acquirer (or Acquirers) that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the provision of telecommunications services; and

    (2)    shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer (or Acquirers) and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V.  DIVESTITURE OF INTERCITY DARK FIBER ASSETS

A.    Defendants are ordered and directed, within 120 calendar days after the closing of CenturyLink's acquisition of Level 3, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to sell the Intercity Dark Fiber Assets in a manner consistent with this Final Judgment to an Acquirer and on terms acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances.  If approval or consent from any government unit is necessary with respect to the sale of the Intercity Dark Fiber Assets by defendants or the Divestiture Trustee and if applications or requests for approval or consent have been filed with the appropriate governmental unit within five (5) calendar days after the United States provides written notice pursuant to Section VII(E) that it does not object to the proposed Acquirer, but an order or other

-13-

dispositive action on such applications has not been issued before the end of the period permitted for divestiture, the period shall be extended with respect to divestiture of those Intercity Dark Fiber Assets for which governmental approval or consent has not been issued until five (5) calendar days after such approval or consent is received.  Defendants agree to use their best efforts to divest the Intercity Dark Fiber Assets and to seek all necessary regulatory or other approvals or consents necessary for such divestitures as expeditiously as possible.

B.     In accomplishing the divestiture ordered by this Section, defendants promptly shall make known, by usual and customary means, the availability of the Intercity Dark Fiber Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of the Intercity Dark Fiber Assets that they are being sold pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Intercity Dark Fiber Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.     Defendants shall permit prospective Acquirers of the Intercity Dark Fiber Assets to have reasonable access to personnel and to such other documents and information customarily provided as part of an IRU transaction, including but not limited to fiber type and performance specifications; date of fiber installation; fiber repair history; fiber maps; route miles; gateway, interconnection, amplification, and regeneration locations; and right-of-way type, owner, and expiration.

D.      Defendants shall warrant to the Acquirer that the Intercity Dark Fiber Assets will be available; provided, however, that the Intercity Dark Fiber Assets may be sold prior to the completion date for additional construction that is required to connect the Dallas to Memphis Dark Fibers to the Memphis Gateway Location specified in Appendix B so long as the defendants have taken all appropriate actions to obtain such permits and approvals and to complete the construction of the connection expeditiously thereafter.  The Defendants will warrant to the Acquirer that the Acquirer or other end user of the Dark Fiber will be able to light each Dark Fiber pair on the Intercity Routes using one set of electronic or optronic equipment.

E.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Intercity Dark Fiber Assets.

F.      Defendants shall warrant to the Acquirer that there are currently no material defects in the environmental, zoning, title, right-of-way, or other permits pertaining to the operation of the Intercity Dark Fiber Assets, and that following the sale of the Intercity Dark Fiber Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, title, right-of-way, or other permits relating to the operation of the Intercity Dark Fiber Assets.

G.      Unless the United States otherwise consents in writing, the sale pursuant to Section V, or by Divestiture Trustee appointed pursuant to Section VI, of this Final Judgment, shall include the entire Intercity Dark Fiber Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Intercity Dark Fiber Assets can and will be used by the Acquirer as part of a viable, ongoing telecommunications services business including the sale of Dark Fiber IRUs to end users.  Divestiture of the Intercity Dark Fiber Assets

must be made to a single Acquirer unless otherwise approved by the United States, in its sole

discretion.  The sale, whether pursuant to Section V or Section VI of this Final Judgment,

> (1)    shall be made to an Acquirer that, in the United States' sole judgment, has
>
> the intent and capability (including the necessary managerial, operational,
>
> technical, and financial capability) of competing effectively in the sale of
>
> Dark Fiber IRUs to end users; and

> (2)    shall be accomplished so as to satisfy the United States, in its sole
>
> discretion, that none of the terms of any agreement between an Acquirer
>
> and defendants give defendants the ability unreasonably to raise the
>
> Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to
>
> interfere in the ability of the Acquirer to compete effectively.

## VI.  APPOINTMENT OF DIVESTITURE TRUSTEE

A.    If defendants have not divested the Divestiture Assets within the time period

specified in Section IV(A) and Section V(A), defendants shall notify the United States of that

fact in writing.  Upon application of the United States, the Court shall appoint a Divestiture

Trustee selected by the United States and approved by the Court to effect the divestiture of the

Divestiture Assets.

B.    After the appointment of a Divestiture Trustee becomes effective, only the

Divestiture Trustee shall have the right to sell the Divestiture Assets.  The Divestiture Trustee

shall have the power and authority to accomplish the divestiture to an Acquirer(s) acceptable to

the United States at such price and on such terms as are then obtainable upon reasonable effort

by the Divestiture Trustee, subject to the provisions of Sections IV, V, VI, and VII of this Final

Judgment, and shall have such other powers as this Court deems appropriate.  Subject to Section

VI(D) of this Final Judgment, the Divestiture Trustee may hire at the cost and expense of

defendants any investment bankers, attorneys, technical experts or other agents, who shall be

solely accountable to the Divestiture Trustee, reasonably necessary in the Divestiture Trustee's

judgment to assist in the divestiture.  Any such investment bankers, attorneys, or other agents

shall serve on such terms and conditions as the United States approves, including confidentiality

requirements and conflict of interest certifications.

      C.     Defendants shall not object to a sale by the Divestiture Trustee on any ground

other than the Divestiture Trustee's malfeasance.  Any such objections by defendants must be

conveyed in writing to the United States and the Divestiture Trustee within ten (10) calendar

days after the Divestiture Trustee has provided the notice required under Section VII.

      D.     The Divestiture Trustee shall serve at the cost and expense of defendants pursuant

to a written agreement, on such terms and conditions as the United States approves, including

confidentiality requirements and conflict of interest certifications.  The Divestiture Trustee shall

account for all monies derived from the sale of the assets sold by the Divestiture Trustee and all

costs and expenses so incurred.  After approval by the Court of the Divestiture Trustee's

accounting, including fees for its services yet unpaid and those of any professionals and agents

retained by the Divestiture Trustee, all remaining money shall be paid to defendants and the trust

shall then be terminated.  The compensation of the Divestiture Trustee and any professionals and

agents retained by the Divestiture Trustee shall be reasonable in light of the value of the

Divestiture Assets and based on a fee arrangement providing the Divestiture Trustee with an

incentive based on the price and terms of the divestiture and the speed with which it is

accomplished, but timeliness is paramount.  If the Divestiture Trustee and defendants are unable

to reach agreement on the Divestiture Trustee's or any agents' or consultants' compensation or

other terms and conditions of engagement within fourteen (14) calendar days of appointment of

the Divestiture Trustee, the United States may, in its sole discretion, take appropriate action,

including making a recommendation to the Court.  The Divestiture Trustee shall, within three (3)

business days of hiring any other professionals or agents, provide written notice of such hiring

and the rate of compensation to defendants and the United States.

   E.  Defendants shall use their best efforts to assist the Divestiture Trustee in

accomplishing the required divestitures, including their best efforts to effect all necessary

regulatory or other approvals or consents and will provide necessary representations or

warranties as appropriate, related to the sale of the Divestiture Assets.  The Divestiture Trustee

and any consultants, accountants, attorneys, technical experts, and other agents retained by the

Divestiture Trustee shall have full and complete access to the personnel, books, records, and

facilities related to the Divestiture Assets, and defendants shall develop financial and other

information relevant to the Divestiture Assets as the Divestiture Trustee may reasonably request,

subject to reasonable protection for trade secret or other confidential research, development, or

commercial information or any applicable privileges.  Defendants shall take no action to interfere

with or to impede the Divestiture Trustee's accomplishment of the divestiture.

   F.  After its appointment, the Divestiture Trustee shall file monthly reports with the

United States and, as appropriate, the Court setting forth the Divestiture Trustee's efforts to

accomplish the divestiture ordered under this Final Judgment.  To the extent such reports contain

information that the Divestiture Trustee deems confidential, such reports shall not be filed in the

public docket of the Court.  Such reports shall include the name, address, and telephone number

of each person who, during the preceding month, made an offer to acquire, expressed an interest

in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about

acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person.  The Divestiture Trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the Divestiture Trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the required divestiture, (2) the reasons, in the Divestiture Trustee's judgment, why the required divestiture has not been accomplished, and (3) the Divestiture Trustee's recommendations.  To the extent such reports contains information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The Divestiture Trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a period requested by the United States.

H.      If the United States determines that the Divestiture Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute Divestiture Trustee.

## VII.  NOTICE OF PROPOSED DIVESTITURE

A.      Within two (2) business days following execution of a definitive divestiture agreement, defendants or the Divestiture Trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or Section V of this Final Judgment.  If the Divestiture Trustee is responsible, it shall

similarly notify defendants.  The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.     Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer(s), any other third party, or the Divestiture Trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), any other potential Acquirer, including, but not limited to, the contract (or contracts) required by Section IV(F) of this Final Judgment.  Defendants and the Divestiture Trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the United States shall otherwise agree.

C.     Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the Divestiture Trustee, whichever is later, the United States shall provide written notice to defendants and the Divestiture Trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section VI(C) of this Final Judgment.  Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated.  Upon objection by defendants under Section VI(C), a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VIII.  FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV, Section V, or Section VI of this Final Judgment.

## IX.  ASSET PRESERVATION

Until the divestitures required by this Final Judgment have been accomplished, defendants shall take all steps necessary to comply with the Asset Preservation Stipulation and Order entered by this Court.  Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## X.  AFFIDAVITS

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV, Section V, or Section VI, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV, Section V, or Section VI of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of the receipt of such affidavit.

B.       Within twenty (20) calendar days of the filing of the Complaint in this matter,

defendants shall deliver to the United States an affidavit that describes in reasonable detail all

actions defendants have taken and all steps defendants have implemented on an ongoing basis to

comply with Section IX of this Final Judgment.  Defendants shall deliver to the United States an

affidavit describing any changes to the efforts and actions outlined in defendants' earlier

affidavits filed pursuant to this section within fifteen (15) calendar days after the change is

implemented.

C.       Defendants shall keep all records of all efforts made to preserve and divest the

Divestiture Assets until one year after such divestiture has been completed.

## XI.  COMPLIANCE INSPECTION

A.       For the purposes of determining or securing compliance with this Final Judgment,

or of any related orders such as any Hold Separate Stipulation and Order, or of determining

whether the Final Judgment should be modified or vacated, and subject to any legally-recognized

privilege, from time to time authorized representatives of the United States Department of

Justice, including consultants and other persons retained by the United States, shall, upon written

request of an authorized representative of the Assistant Attorney General in charge of the

Antitrust Division, and on reasonable notice to defendants, be permitted:

> (1)     access during defendants' office hours to inspect and copy, or at the option
>
> of the United States, to require defendants to provide hard copy or
>
> electronic copies of, all books, ledgers, accounts, records, data, and
>
> documents in the possession, custody, or control of defendants, relating to
>
> any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(g) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(g) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than grand jury proceedings).

## XII.  NO REACQUISITION

Except as provided in this Final Judgment, absent written approval by the United States, in its sole discretion, defendants may not reacquire or lease back any part of the Divestiture Assets during the term of this Final Judgment.

## XIII.  RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.  EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

## XV.  PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

 Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16

Date:  March 6, 2018

*Ketanji Brown Jackson*
Ketanji Brown Jackson
United States District Judge

PAGE INTENTIONALLY LEFT BLANK

**APPENDIX A**

The following customers serviced in the Divestiture MSAs, identified for confidentiality purposes by Level 3's customer identification code, are excluded from the definition of MSA Customers and are not subject to the procedures outlined in Section IV(K) and (L) of this Final Judgment:

1. 1-8UM5C, Tucson, AZ

2. 2-LOTDXB, Albuquerque, NM

3. 2-79C52T, Boise, ID 83716

4. 1-5JXJ4, Albuquerque, NM

5. 2-TRJJST, Boise, ID

**APPENDIX B**

| Route | Origin Gateway Location Address | Termination Gateway Location Address |
|---|---|---|
| Atlanta to Nashville | 55 Marietta St NW<br>Atlanta, GA 30303 | 460 Metroplex Dr<br>Nashville, TN 37211 |
| Birmingham to Billingsley | 2001 Park Pl<br>Birmingham, AL 35203 | 4521 Chilton Rd<br>Billingsley, AL 36006 |
| Charlotte to Atlanta | 731 E Trade St<br>Charlotte, NC 28202 | 55 Marietta St NW,<br>Atlanta, GA 30303 |
| Cleveland to Buffalo | 1501 Euclid Ave<br>Cleveland, OH 44115 | 1090 Harlem Rd<br>Buffalo, NY 14227 |
| Dallas to Memphis | 1950 N Stemmons Fwy<br>Dallas, TX 75207 | 715 S Danny Thomas Blvd<br>Memphis TN 38126 |
| Denver to Dallas | 23751 E 6th Ave<br>Aurora, CO 80018 | 1950 N Stemmons Fwy<br>Dallas, TX 75207 |
| Denver to Kansas City | 23751 E 6th Ave<br>Aurora, CO 80018 | 711 E 19th St<br>Kansas City, MO 64108 |
| El Paso to San Antonio | 201 E Main St<br>El Paso, TX 79901 | 231 Rotary St<br>San Antonio, TX 78202 |
| Houston to New Orleans | 11947 N Fwy<br>Houston, TX 77060 | 1340 Poydras St<br>New Orleans, LA 70112 |
| Indianapolis to Cincinnati | 550 Kentucky Ave<br>Indianapolis, IN 46225 | 607 Evans St<br>Cincinnati, OH 45204 |
| Kansas City to St Louis | 711 E 19th St<br>Kansas City, MO 64108 | 11755 Dunlap Industrial Dr<br>Maryland Heights, MO 63043 |
| Los Angeles to Las Vegas | 624 S Grand Ave<br>Los Angeles, CA 90017 | 4275 E Sahara Ave<br>Las Vegas, NV 89104 |
| Memphis to Nashville | 715 S Danny Thomas Blvd<br>Memphis TN 38126 | 460 Metroplex Dr<br>Nashville, TN 37211 |
| Miami to Jacksonville | 36 NE 2nd St<br>Miami, FL 33132 | 421 W Church St<br>Jacksonville, FL 32202 |
| Nashville to Indianapolis | 460 Metroplex Dr<br>Nashville, TN 37211 | 550 Kentucky Ave<br>Indianapolis, IN 46225 |
| Orlando to Daytona Beach | 121 Weber St<br>Orlando, FL 32803 | 500 W International Speedway Blvd<br>Daytona Beach, FL 32114 |
| Phoenix to El Paso | 429 S 6th Dr<br>Phoenix, AZ 85003 | 201 E Main St<br>El Paso, TX 79901 |
| Portland to Salt Lake City | 707 SW Washington St<br>Portland, OR 97205 | 572 Delong St<br>Salt Lake City, UT 84104 |
| Raleigh to Charlotte | 115 N Harrington St<br>Raleigh, NC 27603 | 731 E Trade St<br>Charlotte, NC 28202 |
| Richmond to Raleigh | 4233 Carolina Ave<br>Richmond, VA 23222 | 115 N Harrington St<br>Raleigh, NC 27603 |
| Sacramento to Salt Lake City | 770 L St<br>Sacramento, CA 95814 | 572 Delong St<br>Salt Lake City, UT 84104 |
| Sacramento to San Francisco | 770 L St<br>Sacramento, CA 95814 | 200 Paul Ave<br>San Francisco, CA 94124 |
| Salt Lake City to Denver | 572 Delong St<br>Salt Lake City, UT 84104 | 23751 E 6th Ave<br>Aurora, CO 80018 |
| San Diego to Phoenix | 4216 University Ave<br>San Diego, CA 92105 | 429 S 6th Dr<br>Phoenix, AZ 85003 |

| Route | Origin Gateway Location Address | Termination Gateway Location Address |
|---|---|---|
| San Francisco to Los Angeles | 200 Paul Ave<br>San Francisco, CA 94124 | 624 S Grand Ave<br>Los Angeles, CA 90017 |
| Tallahassee to Jacksonville | 601 Stone Valley Way<br>Tallahassee, FL 32310 | 421 W Church St<br>Jacksonville, FL 32202 |
| Tallahassee to Tampa | 601 Stone Valley Way<br>Tallahassee, FL 32310 | 5908A Hampton Oaks Pkwy<br>Tampa, FL 33610 |
| Tampa to Miami | 5908A Hampton Oaks Pkwy<br>Tampa, FL 33610 | 36 NE 2nd St<br>Miami, FL 33132 |
| Tampa to Orlando | 5908A Hampton Oaks Pkwy<br>Tampa, FL 33610 | 121 Weber St<br>Orlando, FL 32803 |
| Washington, DC to Richmond | 1500 Eckington Pl, NE<br>Washington DC 20002 | 4233 Carolina Ave<br>Richmond, VA 23222 |